P001

Initialed by CUSTOMER: 
Initialed by KIMBALL:

# SUPPLY AGREEMENT
# BETWEEN
# LUI CORPORATION
# AND
# KIMBALL INTERNATIONAL MANUFACTURING, INC.

THIS SUPPLY AGREEMENT ("Agreement"), is entered into this 9th day of October, 2001, by and between LUI Corporation ("CUSTOMER"), a Maryland corporation, with its principal headquarters at 5500 East Lombard Street, Baltimore, Maryland 21224, and Kimball International Manufacturing, Inc. ("KIMBALL"), an Indiana corporation, with its principal headquarters at 1600 Royal Street, Jasper, Indiana, 47106.

## STATEMENT OF FACTS

KIMBALL manufactures and markets a comprehensive line of office furniture products. KIMBALL desires to manufacture and sell to CUSTOMER, and CUSTOMER desires to purchase from KIMBALL the "Products" described on the attached Exhibit A.

## AGREEMENT

In consideration of the facts set forth and the mutual promises and undertakings set forth below, the parties agree as follows:

Section 1. Commitment. CUSTOMER will be the reseller and KIMBALL will be CUSTOMER's exclusive manufacturer of the "Products". CUSTOMER will sell the "Products" under its own trade name. Based on CUSTOMER's purchase orders that are accepted in writing by KIMBALL, KIMBALL will use commercially reasonable efforts to supply CUSTOMER with all of CUSTOMER's requirements for the Products for the term of this Agreement (excepting any circumstances beyond the reasonable control of KIMBALL). CUSTOMER may not market the Products under the "KIMBALL" trade name, but may generically incorporate on an O.E.M. basis the Products into its own product line to be marketed under "CUSTOMER" or related trade names. In addition, CUSTOMER may not make any reference, directly or indirectly, to KIMBALL as the manufacturer of the Products, or make any comparisons of the Products' quality or characteristics as being similar or equivalent to those of other products marketed by KIMBALL, or use or communicate in any other manner the name "Kimball" or KIMBALL involvement in the Product manufacturing without the specific written permission of an executive officer of KIMBALL.

1.1 Performance. CUSTOMER and KIMBALL desire to provide quality Product on a timely basis to its customers. To achieve that goal, KIMBALL and CUSTOMER will set Product sale/purchase projections, performance goals and measurements for complete and on-time shipment of Products.

*EXHIBIT A*

Initialed by CUSTOMER: ___
Initialed by KIMBALL: ___

1.1.1  Delivery/Shipment. Delivery shall be made F.O.B. KIMBALL's plant. CUSTOMER shall bear responsibility for any shipping costs, expenses and shipping damage, latent or patent from such point. CUSTOMER is responsible for the logistics of transportation from KIMBALL's plants.

1.2  Indemnification

1.2.1  Indemnification. CUSTOMER agrees to save, indemnify and hold harmless KIMBALL, its parent corporation, its subsidiary and affiliated corporations, and their respective officers, directors, employees, agents and consultants, from and against any and all liability, claims, judgments, demands for damages, loss, costs, charges, and expenses of whatever kind or nature (including reasonable attorney's fees), which KIMBALL shall or may, at any time, sustain or incur by reason or in consequence of injury or damage to an ultimate user or other person caused by the negligent acts of CUSTOMER, CUSTOMER's breach of this Agreement, and/or any defect in any design, drawing, specification or material of the Products. CUSTOMER will defend any and all such suits that may be brought against KIMBALL on account of such alleged injury or damage, and shall employ an attorney of its own selection to appear and defend any lawsuits or other legal action on KIMBALL'S behalf and at the sole expense of CUSTOMER.

1.2.2  Indemnification. KIMBALL agrees to save, indemnify and hold harmless CUSTOMER against any and all liability, claims, judgments, demands for damages, loss, costs, charges and expenses of whatever kind or nature (including reasonable attorney's fees) which CUSTOMER shall or may, at any time, sustain or incur by reason or in consequence of injury or damages to an ultimate user or other person caused solely by a defect in the manufacture of the Product. KIMBALL will defend any and all such suits that may be brought against CUSTOMER under this Section 1.2.2 on account of such alleged injury or damage, and shall employ an attorney of it's own selection to appear and defend any lawsuits or other legal action on CUSTOMER's behalf and at the sole expense of KIMBALL.

1.3  Insurance

1.3.1  Insurance. CUSTOMER agrees to maintain product liability insurance and general liability insurance in a sufficient amount, but not less than $1,000,000 per occurrence. CUSTOMER agrees to provide KIMBALL with a certificate of insurance annually with notification in writing thirty (30) days in advance as to any material changes in the insurance coverage.

1.3.2  Insurance. KIMBALL agrees to maintain commercial general liability insurance in the amount of $1,000,000 per occurrence. KIMBALL agrees to provide CUSTOMER with a certificate of insurance annually with notification in writing thirty (30) days in advance as to any material changes in the insurance coverage.

2

Initialed by CUSTOMER: ___
Initialed by KIMBALL: ___

1.4 **Intellectual Property.** Kimball shall be the owner of, and retain all rights and duties of ownership in and to, the designs or intellectual property incorporated into or associated with Products sold to CUSTOMER that are part of the veneer casegood lines manufactured at KIMBALL. KIMBALL hereby grants a license to CUSTOMER for non-exclusive use of such intellectual property rights. Upon termination of this Agreement, such license shall also terminate except to the extent necessary for CUSTOMER or its customers to use Products already marketed and sold. CUSTOMER shall own all tooling or other materials that it has paid for.

CUSTOMER shall be the owner of Product designs, and retain all rights and duties of design ownership into or associated with Products that CUTOMER has brought to KIMBALL for manufacturing. Unless otherwise agreed to in writing, KIMBALL shall be the owner of, and retain all rights of ownership in and to, the intellectual property incorporated into or associated with the manufacture of any Products sold to CUSTOMER pursuant to the terms of this Agreement.

**Section 2. Territory.** CUSTOMER and KIMBALL each will have the right to market the Products in the global marketplace during the term of this Agreement.

**Section 3. Pricing; Standard Terms and Conditions.** The pricing for the Products is described in Exhibit A. Product prices do not include sales tax. Other terms and conditions governing this Agreement are described in Exhibit B titled "General Information and Standard Terms and Conditions of Sale." Both Exhibits A and B are attached hereto and incorporated herein by reference.

3.1 **Changes.** KIMBALL will supply CUSTOMER with notice of changes in Pricing at least one hundred and twenty (120) days prior to the effective date of such change. KIMBALL and CUSTOMER will review pricing annually sometime during the third quarter of KIMBALL's fiscal year.

3.2 **Product Inventories.** CUSTOMER shall be required to purchase all Products, finished goods, and work in progress inventories purchased for use in manufacturing CUSTOMER's Products upon termination of this Agreement. CUSTOMER shall be required to purchase all raw material inventories still on hand as of the date of this Agreement. From the Agreement date forward, all raw material under 45-days on hand will be the responsibility of the CUSTOMER. From the Agreement date forward, all raw material over 45-days on hand will be the responsibility of KIMBALL. CUSTOMER shall be required to purchase immediately all Obsolete Products, finished goods, Work In Progress, and raw materials inventories purchased for use in manufacturing Products that become Obsolete Products from CUSTOMER's decision. An "Obsolete Product" means any Product that KIMBALL, pursuant to Section 1 of this Agreement, has manufactured and held in its finished goods inventory for more than 45 days. A more detailed description on Product Inventories that apply to specific KIMBALL plants is shown in attached Exhibit D.

3

Initialed by CUSTOMER:
Initialed by KIMBALL:

Section 4. **Product Line Expansion.** KIMBALL and CUSTOMER agree that the provisions of this Agreement shall in no way affect KIMBALL or CUSTOMER'S ability to develop or market office furniture products in the future, for itself or other customers.

Section 5. **Contract Term.** KIMBALL and CUSTOMER agree to continue this Agreement indefinitely from the date of this Agreement, unless earlier terminated under the provisions set forth in this Agreement. Minimum term of this agreement shall be two (2) years from the date of this Agreement.

Section 6. **Termination Privileges.** This Agreement shall terminate on the occurrence of any of the following events:

6.1 **Notice.** KIMBALL or CUSTOMER may terminate this Agreement by giving the other party at least one hundred eighty (180) days written notice of its desire to terminate this Agreement after the initial two (2) year minimum term Agreement.

6.2 **Insolvency, Bankruptcy, Receivership.** This Agreement may terminate automatically if either KIMBALL or CUSTOMER: (a) becomes insolvent; (b) files a petition for voluntary bankruptcy; (c) shall be adjudicated bankrupt; or (d) is subject to receivership.

Section 7. **Warranty.** KIMBALL will provide the Product warranty that is described in Exhibit C attached hereto. THERE ARE NO OTHER PRODUCT WARRANTIES, EXPRESS OR IMPLIED. ALL IMPLIED WARRANTIES OF ANY KIND AND SORT ARE EXPRESSLY DISCLAIMED, INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE.

Section 8. **Relationship.** Both KIMBALL and CUSTOMER shall remain independent parties. This Agreement shall not create any joint venture, partnership or similar relationship between the parties.

Section 9. **Notices.** All notices, demands, or requests made pursuant to this Agreement must be in writing and must be personally delivered or mailed to the party to which the notice, demand or request is being made, by certified or registered mail, return receipt requested, delivery by recognized overnight courier requiring a signature, or sent by telecopier with confirmation (hardcopy to follow by regular U.S. mail), as follows:

9.1  LUI Corporation
     5500 East Lombard Street
     Baltimore, Maryland 21224
     ATTN: Jim Crystal

4

Initialed by CUSTOMER
Initialed by KIMBALL

9.2  Kimball International Manufacturing, Inc.
     1600 Royal Street
     Jasper, Indiana 47106
     ATTN: Robert B. Faught, Jr.

or at such different address as either KIMBALL or CUSTOMER shall hereafter specify by written notice as provided in this Agreement. Notices shall be deemed given: a) if mailed, on the third (3rd) business day after being placed in the United States mail; b) if personally delivered, upon personal delivery; c) if sent by overnight courier or telecopier, on the next business day; or d) if transmitted by telecopier, upon completion of the transmission.

Section 10. Modification. This Agreement and the Exhibits hereto, each of which is incorporated in this Agreement (whether attached before or after executions hereof), set forth all the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof, and supercede all prior or contemporaneous agreements, express or implied, oral or written. No change or modification of this Agreement shall be valid unless it is made in writing and signed by both parties.

Section 11. Assignability. Neither party shall have the right to assign its interests, duties, or responsibilities in this Agreement without the written consent of the other party. KIMBALL's subsidiaries, affiliates, parent, or successor, may produce product for CUSTOMER as required under the terms of this Agreement with CUSTOMER's prior consent.

Section 12. Invalid Provision. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions, and the Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 13. Applicable Law and Jurisdiction. This Agreement shall be governed by the laws of the State of Indiana, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. Any action or proceeding seeking to enforce the terms of this Agreement, or based on any right arising out of this Agreement must be brought in the appropriate court located in Dubois County, Indiana, or if jurisdiction will so permit, in the Federal District Court for the Southern District of Indiana located in Evansville, Indiana. The parties hereto consent to the jurisdiction and venue of said courts.

Section 14. Captions. The captions of the several sections and subsections of this Agreement are made for convenient reference and shall not modify or amend the expressed terms of this Agreement.

Section 15. Execution and Counterpart. This Agreement may be executed

5

Initialed by CUSTOMER _____
Initialed by KIMBALL _____

in any number of counterparts, each of which shall be taken to be an original.

Section 16. Benefit. This Agreement shall be binding upon, and inure to the benefit of, the successors of KIMBALL and the successors of CUSTOMER.

Section 17. Non-Solicitation. Both parties mutually agree that they will not, during the term of this Agreement (or within one (1) year after termination of the Agreement), knowingly solicit or hire current employees or independent sales representatives of the other company, without the other party's written consent.

Section 18. Confidentiality. The parties understand that by virtue of this Agreement, each may become privy to the other's business techniques, sales strategies, promotional materials, designs, prices, contact reports, and customer records, which are secret and confidential and are not as a matter of corporate policy ever disclosed to the public. Each of the parties therefore agrees that it will not, at any time during the term of this Agreement, or after its termination, use, reveal, divulge or make in any way known to any person, firm or corporation, the specifics of the business, techniques, any materials, sales strategies, or services rendered by the other however the same shall or may have been originated, formulated, or defined; or reveal, divulge or make known to any persons, firm or corporation, prices and customer records, or other written or unwritten knowledge or proprietary information not already available to the public, for any reason whatsoever.

18.1. The parties agree that upon a breach or violation of the foregoing paragraph, the non-breaching party shall be entitled as a matter of right to seek relief in any court of competent jurisdiction enjoining such breach or violation, in addition to all other remedies provided at law, in equity or under this Agreement. The breaching party shall pay all costs and expenses incurred by the non-breaching party in a successful enforcement action hereunder, including reasonable attorneys' fees. If the period of time or the area herein specified should be judged unreasonable in any court proceeding, then the period of time shall be reduced by such number of months, or the area reduced by such mileage, so that the foregoing nonsolicitation covenant may be enforced in such area and during such period of time as are judged to be reasonable. Upon the occurrence of a breach of this provision, the time period herein specified shall be extended by a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have terminated.

Section 19. Non-Performance. Non-performance by either party, of any duty or obligation hereunder, caused by natural disaster, or other acts of God shall not be deemed a breach of the contract by such non-performing party. In the event of non-performance by either party or a breach of any obligation imposed upon them under this Agreement, then the breaching party shall indemnify and hold the non-breaching party harmless for any cost or expense

6

Initialed by CUSTOMER
Initialed by KIMBALL

(including reasonable attorney's fees) arising out of such non-performance or default.

Section 20. No Waiver. Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power, or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege. Any waiver of such item with respect to any one occurrence will not be construed as a similar waiver with respect to any other occurrence.

Section 21. Expense of Transaction. KIMBALL and CUSTOMER will each pay all of their own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, all accounting and legal fees.

Section 22. Priority. All of the provisions, terms and conditions of this Agreement govern, control and supercede any conflicting provision, term or condition that may appear in any purchase order or other writing issued by CUSTOMER.

Section 23. Limitation of Liability. NOTWITHSTANDING ANY PROVISION OR PARAGRAPH OF THIS AGREEMENT OR ANY PURCHASE ORDER TO THE CONTRARY, NEITHER KIMBALL NOR ANY OF ITS DIVISIONS OR SUBSIDIARIES WILL BE LIABLE TO CUSTOMER FOR ANY INDIRECT, PUNITIVE, SPECIAL, OR CONSEQUENTIAL (INCLUDING LOSS OF PROFITS, LOSS OF OR USE OF DATA, AND/OR INTERRUPTION OF BUSINESS) DAMAGES, EVEN IF KIMBALL KNOWS OR SHOULD KNOW THE POSSIBLITY OF THE SAME, CAUSED BY THE FURNISHING OF ANY PRODUCT, GOOD OR SERVICE OR THE SUBSEQUENT USE OR PERFORMANCE THEREOF PROVIDED UNDER THIS AGREEMENT OR ANY PURCHASE ORDER, AND IN ANY EVENT, KIMBALL'S MAXIMUM LIABILITY UNDER THIS AGREEMENT OR ANY PURCHASE ORDER SHALL NOT IN ANY CASE EXCEED THE PRICE OF THE PARTICULAR PRODUCT, GOOD OR SERVICE BEING FURNISHED BY KIMBALL TO CUSTOMER.

IN WITNESS OF WHICH, the parties have executed this Agreement.

LUI Corporation
("CUSTOMER")

By: _____
Printed: James Crystal
Title: President (Jim Crystal)

Kimball International Manufacturing, Inc.
("KIMBALL")

By: _____
Printed: John Brent Elliott
Title: Executive Vice President, Kimball International (Brent Elliott), President, Kimball International Mfg., Inc.

Initialed by CUSTOMER:
Initialed by KIMBALL:

# EXHIBIT A

(Page 1 of 1)

8

Initialed by CUSTOMER
Initialed by KIMBALL

# EXHIBIT B

(Page 1 of 2)

## GENERAL INFORMATION & STANDARD TERMS & CONDITIONS OF SALE

I. TERMS

    A. Net 45 days from date of invoice.

    B. There may be mutually agreed upon situations where KIMBALL and CUSTOMER agree to modify pricing and terms for special competitive situations.

II. ORDER CONFIRMATION

    A. All orders from CUSTOMER will be confirmed by KIMBALL prior to production.

    B. KIMBALL will manufacture and invoice based on the information on the order confirmation.

III. SHIPPING DATES

    A. All order confirmations will contain the shipping date.

IV. ORDER PLACEMENT

    A. All orders will be in electronic or tangible form. KIMBALL prefers orders to be placed electronically.

V. TITLE OF SHIPMENT

    A. Once the Product is picked up by the carrier, title of the Product and risk of loss passes to CUSTOMER.

    B. If the goods are damaged by the carrier while in transit, CUSTOMER has the sole obligation of seeking any recourse against the carrier.

VI. SHIPMENTS

At CUSTOMER's sole cost and expense, CUSTOMER will arrange shipment of Products according to CUSTOMER's instructions set forth in each purchase order (the "Shipping Instructions"). If the Shipping Instructions advise KIMBALL to ship "Best Way," KIMBALL will ship with

9


Initialed by CUSTOMER
Initialed by KIMBALL

## EXHIBIT B

(Page 2 of 2)

its carrier of choice. The Shipping instructions will specify that the Products are to be shipped (1) Freight Prepaid and Add, (2) Freight Collect, or (3) Third Party Billing.

VII. MISCELLANEOUS CLAIMS

   A. Claims against KIMBALL must be made in writing from CUSTOMER.

VIII. WARRANTY (see attached Exhibit C)

IX. LABELING

   A. CUSTOMER trade name will be attached to Product packaging when specified by CUSTOMER. The KIMBALL trade name will not appear on any packaging, Product or literature reaching the end-user of the Product.

(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

10



Initialed by CUSTOMER
Initialed by KIMBALL:

## EXHIBIT C

## PRODUCT WARRANTY

(Page 1 of 1)

KIMBALL warrants to CUSTOMER the following from the date of manufacture:
- Services performed under this Agreement will be done in a workmanlike manner
- Products will comply with the designs, specifications, drawings, descriptions as specified by CUSTOMER and accepted by the KIMBALL
- Products will be free of defects in workmanship

KIMBALL warrants that its products will be free from defects in material and workmanship for a period of two years from date of manufacture, given normal use and proper care in a single shift environment. If a warranty claimant provides KIMBALL with the serial number of the defective product, KIMBALL will repair or replace, at KIMBALL's option, any product, part or component found to be defective within the terms of this warranty. CUSTOMER will indemnify KIMBALL for any defects in Design, plans, or specifications as set forth in this Agreement.

The warranty does NOT cover:

- Damage caused by a carrier during shipment
- Customer's own materials (COM)
- Natural variations in wood, laminate, leather, or marble
- Naturally occurring variations in colorfastness, grain characteristics, color, or texture of wood and other covering materials
- Engineering to Order (ETO) or other nonstandard configurations (Specials)
- Legal claims processing, settlement costs, repair, or replacement of defective Product as a result of deficiency in Product Design

This warranty is given to the initial purchaser of new products purchased from the CUSTOMER. The warranty, which is non-transferable, covers defects in materials and craftsmanship found during normal usage of products. KIMBALL assumes no responsibility for injuries or damage to Products resulting from user modifications, misuse, abuse, alteration, or negligent use. Also, warranty for product is void if Product Identification Tag attached to Product has been removed.

THERE ARE NO OTHER PRODUCT WARRANTIES, EXPRESS OR IMPLIED. ALL IMPLIED WARRANTIES OF ANY KIND AND SORT ARE EXPRESSLY DISCLAIMED, INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE.

11


Initialed by CUSTOMER:
Initialed by KIMBALL:

## EXHIBIT D

## PRODUCT INVENTORIES

(Page 1 of 1)

This Supply Agreement reflects the new status of Made To Order Business that KIMBALL will be providing the CUSTOMER with Products immediately from KIMBALL's Heritage Hills Plant, and with KIMBALL's KOCM Plant when the 10-day lead time is initiated. This means that there would no longer be any finished goods in existence, and that CUSTOMER would not be responsible for any raw material or Work In Progress over 45 days old. This new Agreement does confirm that CUSTOMER is responsible for any finished goods and raw material in place at KIMBALL's KOCM Plant when this Agreement is signed. This reflects the main element of the existing KIMBALL/CUSTOMER Supply Agreement for KIMBALL's KOCM Plant. When KIMBALL's KOCM Plant initiates the 10-day lead-time, there will be no more finished goods inventory produced at that Plant. The goal is to deplete the finished goods and raw material that have been at the KOCM Plant, much for over a year from the date of this new Agreement, as soon as possible. After two (2) years from the date of this signed Agreement, CUSTOMER will take total ownership of all finished goods and raw material still remaining from the date of this Agreement. During the first year following the signed Agreement, KIMBALL will manage the partnership even closer with CUSTOMER, by supporting CUSTOMER's attempts to promote, sell, and value engineer solutions that will deplete all finished goods that now exist.

## (END OF SUPPLY AGREEMENT)

12